JOURNAL ENTRY AND OPINION
{¶ 1} Appellant Biswanath Halder appeals his conviction and sentence. Halder assigns the following errors for our review:
 "I. The trial court erred in finding appellant competent to stand trial."
 "II. The trial court erred by failing to allow appellant to represent himself."
 "III. Over defense objections, the trial court improperly dismissed prospective jurors based upon their views of capital punishment."
 "IV. The State improperly adduced victim-impact evidence during the culpability determination phase of trial."
 "V. The trial court improperly restricted appellant's ability to present evidence of diminished capacity to the jury in the culpability phase of trial."
 {¶ 2} Having reviewed the record and pertinent law, we affirm the trial court's decision. The apposite facts follow.
 {¶ 3} On May 29, 2003, the Cuyahoga County Grand Jury handed down a 338 count indictment against Halder. The indictments included three counts of aggravated murder with firearm, felony murder, mass murder, and terrorism specifications. The grand jury also indicted Halder on thirty-five counts of attempted murder with three and five year firearm specifications, and fourteen counts of aggravated burglary with firearm specifications.
 {¶ 4} In addition, the grand jury indicted Halder on two hundred and eighty-one counts of kidnapping with firearm specifications. Further, the grand jury indicted Halder on one count of terrorism with firearm, felony murder, mass murder and terrorism *Page 3 
specifications. Finally, the grand jury indicted Halder on one count of unlawful possession of a dangerous ordnance.
 {¶ 5} The above indictments emanated from the May 9, 2003, nationally publicized shooting rampage at the Weatherhead School of Management, in the Peter B. Lewis building, on the campus of Case Western Reserve University. A video surveillance camera recorded Halder smashing his way into the building; he was wearing a flak jacket, an army helmet, and an athletic supporter with a cup; he was carrying a Tech 9 semi-automatic machine style handgun and a Berretta nine-millimeter handgun.
 {¶ 6} The video showed that Halder shot and killed the first person he encountered. Thereafter, Halder fired indiscriminately at the occupants and at the police who later arrived. He then held numerous people hostage for approximately eight hours before surrendering to the Cleveland Strategic Weapons and Tactics ("SWAT") team.
 {¶ 7} On June 3, 2003, Halder pleaded not guilty at his arraignment. Halder's defense team challenged his competency, and the trial court ordered a competency evaluation. Competency hearings were held on February 23, 24, March 21, 22, and 23, 2005.
 {¶ 8} The evidence introduced at the hearings reveal that Halder was a 64 year-old man who was born in India and became a United States Citizen in 1980. Halder *Page 4 
has an IQ score of 130. In 1963, Halder obtained a bachelor's degree in electrical engineering from Calcutta University in India. He attended New York University Graduate School of Business in 1980, but dropped out because of financial challenges.
He also attended the University of Massachusetts from 1989 through 1994 where he studied mathematics, computer science, and economics, but did not obtain a degree. From 1995 to 1996, Halder attended Boston University. In 1999, he received an MBA from the Weatherhead School of Management at Case Western Reserve University.
 {¶ 9} The evidence also indicates that Halder had an erratic work history characterized by short-term jobs where he was either terminated or quit because of personality or monetary problems. In addition, Halder has sued many of his former employers alleging racial discrimination or unfair employment practices.
 {¶ 10} In 1999, due to his inability to obtain employment, Halder started WIN (Worldwide Indian Network) Business Council with the stated purpose of assisting people of Indian descent in starting their own businesses. Halder's goal was to extend WIN worldwide. He envisioned that over time, he could solve mankind's problems by narrowing the debt between rich and poor. Halder believed that sometime in the year 2000, Shawn Miller, of Case Western Reserve University ("Case Western"), deliberately destroyed his website's record and deleted the addresses of more than 50,000 contacts. *Page 5 
 {¶ 11} As a result of the alleged infraction, on June 7, 2001, Halder, represented by an attorney, filed a civil suit alleging that Miller maliciously and intentionally destroyed his website. On February 19, 2002, Halder's attorney withdrew stating that he had been unable to obtain cooperation from Halder in producing discovery and in other aspects of the case. Halder's attorney's withdrawal from the civil suit prompted Halder to write a letter to the judge alleging that his opponent had bribed his attorney. Halder further alleged in the letter to the judge that his attorney was withholding vital information from him.
 {¶ 12} Thereafter, Halder represented himself pro se. In September 2002, the trial court dismissed Halder's civil suit, and on April 29, 2003, we dismissed his direct appeal. On May 9, 2003, the shooting incident occurred on Case Western's campus.
 {¶ 13} The evidence introduced during the competency hearings reveal that from 1988 through 1992, Halder was found to be disabled and received social security disability insurance benefits. Halder had been evaluated by seven different social security administration doctors, five of whom diagnosed Halder with a personality disorder, and two diagnosed him with dysthymia and depression.
 {¶ 14} At the hearing, three expert witnesses testified on the issue of competency including Dr. James Eisenberg, who testified that he has been a psychologist for 27 years, 15 of these as a forensic psychologist. Dr. Eisenberg testified that between August 2003 and May 2004, he met with Halder on five separate occasions lasting *Page 6 
approximately eleven hours. Dr. Eisenberg testified that in November 2003, he had issued a preliminary report indicating that Halder was competent to stand trial. Dr. Eisenberg testified that he diagnosed Halder with alcohol dependence, dysthymia and a possible delusional disorder with persecutory type. Dr. Eisenberg also testified that at that time he believed that Halder had the intellectual capacity to make important decisions after receiving advice from counsel.
 {¶ 15} However, Dr. Eisenberg testified that he subsequently changed his opinion regarding Halder's competency to stand trial. Dr. Eisenberg testified that in May 2004, he diagnosed Halder with a personality disorder with narcissistic, paranoid, and obsessive qualities. Dr. Eisenberg testified that he also diagnosed Halder with persecutory and grandiose symptoms. Dr. Eisenberg testified that his subsequent meetings with Halder revealed that Halder was convinced that his attorneys were conspiring against him with the prosecutor and with Case Western. Dr. Eisenberg opined that Halder's delusional-based belief makes it almost impossible for him to have any meaningful collaborative relationship with his attorneys. Dr. Eisenberg testified that Halder's beliefs impairs his rational judgment; consequently, Halder will not accept the advice of his attorneys and will not consult with them as issues arise in the case.
 {¶ 16} Dr. John Fabian testified that he has been a practicing forensic psychologist since 1999, and that he also has a law degree. Dr. Fabian testified that he was contacted by the Court to evaluate Halder because of the conflicting diagnoses *Page 7 
of the other two expert witnesses. He testified that he met with Halder on four separate occasions lasting a total of ten hours. Dr. Fabian testified that he believed that Halder suffered from both delusional and personality disorders. Dr. Fabian also testified that Halder was incapable of rationally assisting his attorneys. He further stated that Halder had a basic mistrust for his attorneys, which was heightened when his attorneys allegedly ceased communicating with him. Finally, he testified that Halder's goal was to take the stand and present all the facts which led to his actions of May 9, 2003.
 {¶ 17} Dr. Barbara Bergman testified that she has been a psychologist for thirty-five years and had been a forensic psychologist for twenty-nine years during which she had completed over fifteen hundred competency evaluations. Dr. Bergman testified that she had met with Halder on five separate occasions lasting approximately 14 hours. She had met with Halder two weeks prior to her appearance at the hearing, so that she could base her opinion of Halder's competency on his present condition. She testified that her observation of Halder indicates that he suffers from a severe personality disorder. She found no evidence that Halder suffered from a major mental disorder, which led her to opine that Halder would be able to assist his trial counsel with his defense.
 {¶ 18} Dr. Bergman testified that although Halder's trial counsels complained that Halder had no recollection of the murder and subsequent seizure of the Peter B. Lewis Building, when she interviewed Halder he recalled in great detail the events of that day. *Page 8 
She stated that if Halder could convey to her the details of the events and answer her questions, then he would be able to assist his attorneys. It was her opinion that Halder was capable of understanding the nature and significance of the charges, the adversarial nature of the prosecutorial process, and, thus was capable of assisting his attorneys.
 {¶ 19} On April 19, 2005, the trial court issued a decision finding that Halder was competent to stand trial. On November 28, 2005, prior to the commencement of trial, the trial court dismissed forty counts of the indictment as being duplicitous. The trial court also dismissed another ninety-six counts and granted the State's motion to amend certain counts and renumber the remaining counts from1 through 202.
 {¶ 20} During its case-in-chief, the State presented the testimony of 105 witnesses and then rested on December 14, 2005. The trial court dismissed all the terrorism specifications. On December 16, 2005, the jury found Halder guilty of counts one through three, capital murder, aggravated murder and capital specification. The jury also found Halder guilty of counts five through forty, capital murder, and counts forty-one through fifty-four, aggravated burglary. Finally, the jury found Halder guilty of one hundred forty-three counts of kidnaping and one count of unlawful possession of a dangerous ordnance.
 {¶ 21} On January 17, 2006, the penalty phase of the trial began. On January 22, 2006, the jury returned a sentencing recommendation of life without the possibility *Page 9 
of parole. On February 17, 2006, the trial court sentenced Halder to life imprisonment without parole.
 Competency to Stand Trial {¶ 22} In the first assigned error, Halder argues the trial court erred in its determination that he was competent to stand trial. We disagree.
 {¶ 23} As the Ohio Supreme Court has observed, "fundamental principles of due process require that a criminal defendant who is legally incompetent shall not be subjected to trial."[1] The test employed to determine if a criminal defendant is, in fact, competent to stand trial was articulated in Dusky v. United States[2]
 "The test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him."[3]
 {¶ 24} The right to a hearing on the issue of competency rises to the level of a constitutional guarantee where the record contains, "sufficient indicia of *Page 10 
incompetence," that an inquiry into the defendant's competency is necessary to ensure his right to a fair trial.[4]
 {¶ 25} By statute, Ohio recognizes the right of a criminal defendant not to be tried or convicted of a crime while incompetent. R.C.2945.37(A) provides in relevant part:
 "In a criminal action in a court of common pleas or municipal court, the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial. If the issue is raised before trial, the court shall hold a hearing on the issue as provided in this section. If the issue is raised after trial has begun, the court shall hold a hearing on the issue only for good cause shown.
 "A defendant is presumed competent to stand trial, unless it is proved by a preponderance of the evidence in a hearing under this section that because of his present mental condition he is incapable of understanding the nature and objective of the proceedings against him or of presently assisting in his defense."[5]
 {¶ 26} It has long been recognized that a person who lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.[6]
 {¶ 27} A defendant is presumed to be competent to stand trial. If, after a hearing, the court finds by a preponderance of the evidence that, because of the defendant's present mental condition, the defendant is incapable of understanding the nature and *Page 11 
objective of the proceedings against the defendant or of assisting in the defendant's defense, the court shall find the defendant incompetent to stand trial.[7]
 {¶ 28} Under constitutional due process principles, the standard for determining competency to stand trial is the same as the standard for determining competency to enter a guilty plea or a plea of no contest.[8] The burden of establishing incompetence, however, is upon the defendant.[9]
 {¶ 29} In reviewing a judge's determination of competency, we examine whether the conclusion was supported by competent, credible evidence.[10] The adequacy of the data relied upon by the expert who examined the defendant is a question for the judge.[11] Where there is a divergence of opinion among experts, the issue becomes a matter of credibility. Under such circumstances, the weight to be given the evidence *Page 12 
and the credibility of the witnesses are primarily for the judge.[12] Moreover, a judge's decision on competency will not be disturbed absent an abuse of discretion.
 {¶ 30} In the instant case, Halder's competency to stand trial was raised before the trial started. The record establishes that the trial court complied with the mandates of R.C. 2945.37 before the trial started. The trial court ordered mental examinations to ensure that Halder was competent to stand trial. Hearings were held pursuant to the statute and all parties were given the opportunity to question the doctors who rendered their impressions, or to lodge objections as to the admissibility of the doctors' reports.
 {¶ 31} Three doctors submitted reports and testified at the competency hearing. Drs. Eisenberg and Fabian found that Halder was not competent to stand trial, while Dr. Bergman found that Halder was competent to stand trial. Dr. Bergman opined that Halder had a severe personality disorder, but showed no evidence of a major mental disorder. The trial court adopted the opinion of Dr. Bergman. A review of the record before us indicates that the trial court's decision was supported by competent, credible evidence.
 {¶ 32} Initially, we note that the record indicates that at the time of the competency hearing, Dr. Eisenberg had not seen Halder for more than a year. *Page 13 
Competency to stand trial is a present condition.[13] Since Dr. Eisenberg failed to conduct an evaluation of Halder within a reasonable time of the competency hearing, his subsequent opinion may be viewed by the trial court as tenuous.
 {¶ 33} Further, the record indicates that Dr. Eisenberg provided two reports with inconsistent conclusions. In the first report dated November 5, 2003, Dr. Eisenberg indicated that Halder had the intellectual capacity to make important decisions after receiving advice from his attorneys and would be able to make intelligent and informed decisions concerning this advice. In the second report dated May 24, 2004, Dr. Eisenberg indicated that Halder's delusional beliefs now made it impossible for Halder to have any meaningful collaborative relationship with his attorneys. Dr. Eisenberg admitted that he arrived at his second conclusion without personally reevaluating Halder. This is fatal to the credibility of Dr. Eisenberg's second opinion.
 {¶ 34} The record indicates that Halder was able to provide answers to direct questions posed by the experts who evaluated him. Dr. Bergman testified that when she interviewed Halder, she allowed him to first talk about things that were important to him. She would then talk with him about the shooting and other issues pertinent to Halder's competency to stand trial. Dr. Bergman found that this approach resulted in Halder providing detailed answers to her queries. Dr. Bergman testified as follows: *Page 14 
 "Q. Okay. Well, explain what did you ask Mr. Halder in response to your evaluation?
 "A. Well, I started by asking him to tell me what happened that led up to that day. And of course we had talked for hours already, or I had listened for hours about — his belief that Shawn Miller had vandalized his website and how he believed that the university was involved. So we had talked about all of that. In Mr. Halder's mind that is all part of what happened that day. And then I asked him various questions based on what he told me and also based on the videotape. I asked him questions about why he was wearing the hairpiece; why he had the helmet; where he got — the flat [sic] jacket; why he wore the flat [sic] jacket.
 "* * *
 "Q. Okay. And what was his response to the hair wig, the helmet, the mask, the jacket?
 "A. Well, he said that he has been wearing the hairpiece since 1985 so that was nothing unusual for him according to him. He has several hairpieces he said. * * * He told me he bought the helmet and the flak jacket some time ago. He was — he would not tell me exactly how long ago he bought them. He was very evasive about where he bought them. He told me `You can buy them anywhere.' And I said, `Well, anywhere like Wal-Mart? You know, Target? Where? Where do you buy these things? I've never seen anything like that in a store I shop in.' He wouldn't tell me exactly where he bought them. He bought the weapons. They were already semiautomatic when he bought them he says. And I pressed him on that because I — it's my understanding that semiautomatic weapons are illegal so you wouldn't legally buy something that's illegal. He wouldn't tell me where he bought them but denied that he modified the weapons himself.
 "Q. Okay.
 "A. I asked him what he was thinking about before he ever went to Case Western Reserve. He said that he began to realize he would have to do something or Shawn Miller would just continue with the evil things that he was doing. He showed me an article from a newspaper about the *Page 15 
economic impact of cyber crime. He called Shawn Miller a cyber criminal because he hacked into his website. He realized after exhausting all his legal remedies and the suit not — him not being able to get anywhere with the civil suit that he wasn't able — that he wasn't going to be able to address the problem in the legal arena. [sic] He tried that first. So he said he decided to go to Case Western Reserve University. He put the bags with the paper, all those papers in the car and put the guns in the car. He put the ammunition in the car. He said he needed 4 or 500 rounds to fill up all the magazines on the guns. He put the hammer in the car. He drove the car and left it behind the Peter B. Lewis Building. In order to get inside he smashed through the door. He did not have — students have a card they swipe. He wasn't a student there at the time so he knew he wasn't going to be able to get into the building because it's a security building so he smashed through the door with the hammer to get in. He said that he put the helmet — I said `Why did you put the helmet on your head?' He put a helmet on his head to protect his head from bullets. He knew that the police would be shooting at him."[14]
 {¶ 35} The above excerpt indicates that Halder was able to provide detailed answers to questions that were pertinent to the issue of his present ability to assist his attorneys in defending him. Dr. Bergman testified about her reasons for asking the above questions as follows:
 "My purpose in asking any of those questions is in order to determine whether or not an individual is capable of telling his attorneys what happened. I have to find out if he can tell me what happened. If he can't tell me what happened then I have to look elsewhere. But if a defendant can tell me in detail and answer questions that I have then I make the assumption they are capable of telling their attorneys as well."[15] *Page 16 
 {¶ 36} Dr. Bergman concluded that if Halder could provide answers to questions as excerpted above, then Halder was capable of consulting with his attorneys with a reasonable degree of rational understanding.
 {¶ 37} In addition, Dr. Fabian acknowledged that Halder also provided detailed answers to questions he posed. For example, Halder indicated that he used a helmet and bulletproof vest to protect himself from the bullets the police would shoot. Halder also indicated that he did not wear a wig to conceal his identity, that he did not answer where he got the guns, and that he knew that he gave the police a statement that was not mirandized. Again, Halder's ability to provide this type of information to Dr. Fabian is further evidence that Halder can consult with his attorneys about the case.
 {¶ 38} The record before us indicates that the prison nurse reported that Halder acted odd, presented himself as very entitled, and "wore out" one social worker with his demands. However, despite this behavior, the record indicates that Halder was not found to be mentally ill by any of the prison physicians who evaluated him. Dr. Bergman testified that Halder was seen by two prison physicians shortly after he was arrested, both of whom thought that Halder was psychotic. A third physician, Dr. Rizk, did follow up treatments once per month thereafter. Dr. Bergman testified as follows regarding Dr. Rizk's diagnosis:
 "* * * The first time he saw him he diagnosed him with major depression with psychosis. That was in June. By July he diagnosed him with adjustment disorder depressed or no diagnosis on Axis I. Axis I is the *Page 17 
axis on which you diagnose mental illness. And then he saw him again in September, October, December, and February. So as time went by and he had more experience and more observation with Mr. Halder, he decided that Mr. Halder was not mentally ill, diagnosed him with dysthymia, which was one of the diagnoses that one of the other psychologists had given when they were evaluating for the appeals for the disability. And in April he wrote in the clinical mode, `Does not suffer from psychosis and does not require placement on the psych floor. No psychosis; no major depression; no anxiety; no need for further evaluation except PRN,' which means as needed. So he had prescribed Zoloft which is an anti-depressant but he discontinued that prescription in February."[16]
 {¶ 39} It is clear from the above that Halder suffers from a severe personality disorder that makes him unwilling to assist his attorney with his defense. However, as the Berry Court noted, willingness to assist one's own attorney in one's defense is not the test for competency. The proper inquiry is the defendant's present ability to so assist.[17] We are also mindful of the holding in State v.Bock,[18] where the Ohio Supreme Court noted that incompetency to stand trial must not be equated with mere mental or emotional instability or even with outright insanity. A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel.[19] *Page 18 
 {¶ 40} After reviewing the entire record before us and examining the totality of the evidence on the issue of competency, we conclude that there was competent, credible evidence before the trial court to support a finding of competency to stand trial. The trial court had sufficient evidence to indicate that Halder was presently capable of consulting with his attorneys. As such, this Court will not disturb that finding. Accordingly, we overrule the first assigned error.
 Self-Representation {¶ 41} In the second assigned error, Halder argues the trial court denied him the right to self-representation. We disagree.
 {¶ 42} Halder was indicted on May 29, 2003, and the trial was set for November 14, 2005. On November 9, 2005, at a hearing to disqualify his second set of appointed lawyers and five days before trial was to start, Halder uttered the following words in response to the trial court's denial of his motion to disqualify and appoint new counsel: "In this case from now onward, I want to proceed pro se."
 {¶ 43} Prior to this request, Halder had made various motions from September 2003 to November 9, 2005; he moved to disqualify and to replace his lawyers, but never to proceed pro se. Following the competency ruling, the first set of lawyers withdrew and the trial court appointed new counsel. On September 1, 2005, Halder moved to disqualify the second set of lawyers. The trial court held a hearing on September 21, 2005. *Page 19 
 {¶ 44} At that hearing, Halder stated: "As of today they have not done anything. So far they have not done anything at all."[20] One of the assigned counsel, who Halder had specifically requested, indicated that the defense team had been working diligently on the case. Attorney John Luskin stated the following:
 "So the record is clear, Mr. Halder has given us a number of different tasks to accomplish. I have spent numerous hours trying to track down people and information as far as New Delhi, India, London, England. Places of that nature. I spent hours trying to obtain information for him. Much of the information that I tried to obtain off the internet pursuant to his instructions has been basically negated. A number of the web sites that I have been referred to have been shut down for whatever reasons. The people have not responded to my letters, and I asked them to contact me to help Mr. Halder. Those people seem to have abandoned him in his time of need. * * * Your Honor, there is varying factors and theories in the case. I respect Mr. Halder's theory of the case. I understand thoroughly what his theory of the case is. As part of the defense strategy that I will not be able to reveal at this particular point in time, I am not sure those people are crucial. I think those individuals Mr. Halder needs or wants, friends that were called upon but for whatever reason they are not responding to me, and he is unable to get in touch with them himself."[21]
It was after denying Halder's motion to replace the second set of lawyers that the trial court set the trial for November 14, 2005.
 {¶ 45} Subsequently, on November 4, 2005, Halder filed another motion to disqualify his attorneys. In the motion to disqualify his attorneys, Halder stated that his attorneys did not know the background of the case, had not conducted discovery, and *Page 20 
had not contacted a single witness. On November 9, 2005, the trial court held a hearing on the motion and all of Halder's assertions were refuted. The trial court ruled that the motion was without merit and denied it. After the trial court denied the motion, Halder, for the first time in the proceedings, made the following statement: "Inthis case from now onward, I want to proceed pro se."
 {¶ 46} The record then reveals the following discourse:
 "The Court: You want to represent yourself pro se?
 The Defendant: Yes.
 The Court: Would you like to say anything about that, sir?
 The Defendant: Anything about what?
 The Court: Your reason. You are making a motion of the Court, an oral motion of the Court to represent yourself?
 The Defendant: Yes. I made myself very clear that my attorneys do not know the background of the case, have done no discovery whatsoever. They have not contacted a single witness, despite the fact that I know numerous people around the world. And they have not done anything. Therefore, I will be much better off having pro se than having these lawyers."[22]
 {¶ 47} The trial court then heard from Halder's lawyer who assured the court that he was doing his best to represent Mr. Halder. The court then stated to Mr. Halder that it planned to rule on his motion at a later time. The court explained that it needed to *Page 21 
research his request to represent himself. The court especially wanted to read Faretta v. California[23] Her concern was whether he had an absolute right to proceed pro se.
 {¶ 48} On the next day, the judge made the following pronouncement from the bench:
 "* * * That defendant made an oral motion to represent himself pro se. The motion is denied. While the defendant has a right to represent himself, pursuant to State v. Vrabel, the cite will be in my opinion, and under Faretta versus California, Mr. Halder, which is a case that you provided to the Court, your right to represent yourself pro se is not absolute. The defendant's request must be made in a timely fashion. On September 16 of `05 this Court set, on the agreement of all parties, that the trial was due to begin on November 14. Defendant's oral motion to represent himself was made on November 9, five days prior to trial beginning on Monday.
 "This Court finds the defendant's motion is untimely. Defendant was indicted on this case nearly two-and-a-half years ago, and the voir dire with respect to jurors and the jury is due to begin in five days. Furthermore, the defendant made his pro se motion immediately after the Court denied his written motion to disqualify his current attorneys. Therefore, the oral motion to represent himself pro se appears to be merely a tactic for delay and, due to the untimely request, it is denied. And then I cited the United States versus Mackovich case and the Vrabel case, which I talked about yesterday. And the cites are in here. So, I am going to sign this and put it in the docket today."[24]
 {¶ 49} As a matter of law, a defendant has a right to represent himself and proceed without counsel when he constitutionally elects to do so.[25] Thus, his decision to proceed pro se must be made voluntarily, knowingly, and intelligently. When a trial *Page 22 
court denies a properly invoked right to self-representation, the denial is per se reversible error.[26]
 {¶ 50} Our concern in this case is whether it was properly invoked. To be properly invoked, a pro se request must be unequivocal and timely; otherwise, the trial court may, in its discretion, deny the request.
 {¶ 51} In State v. Cassano,[27] the Ohio Supreme Court held that a defendant's assertion of the right to proceed pro se must be clear and unequivocal, knowing, intelligent, voluntary, and timely. This requirement was also addressed in United States v. Bush[28] InBush, the court stated:
 "The requirement that the assertion be clear and unequivocal `is necessary to protect * * * against an inadvertent waiver of the right to counsel by a defendant's occasional musings,' and it also `prevents a defendant from taking advantage of and manipulating the mutual exclusivity of the rights to counsel and self-representation.' Id. at 558-59 (internal quotation marks omitted.) Additionally, `in ambiguous situations created by a defendant's vacillation or manipulation, we must ascribe a `constitutional primacy' to the right to counsel.' Id. `At bottom, the Faretta right to self-representation is not absolute, and the `government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.' Id. (quoting Martinez v. Court of Appeal, 528 U.S. 152, 145 L.Ed.2d 597, 120 S.Ct. 684 (2000))." *Page 23 
 {¶ 52} In Bush, the appellate court did not disagree with the trial court's denial of Bush's request to proceed pro se; however, it did point out that a district court may deny a request when the request is made to manipulate.
 {¶ 53} Before we address whether Halder properly invoked the right to proceed pro se, we will address whether the trial court made a sufficient inquiry into his right to waive counsel and represent himself. When the trial court first learned of Halder's request to proceed pro se, it was several years after his indictment, the second request for new lawyers, and after he had been held competent to stand trial. Each of his six written and several oral motions to disqualify his lawyers were made by him to the court.
 {¶ 54} His first request to proceed pro se was in the environment of a denial to disqualify his lawyers and proceed on his own. The trial court heard from him, his lawyers, and the State. The trial court did not rule immediately; the trial judge ruled the next day and made it clear that the denial to allow him to proceed pro se was because his request was untimely. The trial court in making its decision relied on some, if not all, of the cases cited herein. Consequently, it is our conclusion that a sufficient inquiry of the waiver was made.
 {¶ 55} Turning next to the proper invocation of the pro se request, we are persuaded as a matter of law that the request was equivocal and untimely. Halder had never in the two and one-half years asked to proceed pro se. His pro se request was *Page 24 
made four days before trial and only after the trial court had refused to disqualify his present counsel and appoint a third lawyer.
 {¶ 56} We also note that Halder consistently maintained that his lawyers had not done what he had asked, which included having several people from India subpoenaed. The lawyer responded that under the circumstances much of what Halder wanted to pursue did not aid in the trial of his case. In United States v. Frazier-El,[29] cited inState v. Cassano, the court held that a trial court must be permitted to distinguish between a manipulative effort and a sincere desire to proceed pro se.
 {¶ 57} Finally, we conclude that his request was untimely. InUnited States v. Mackovich,[30] a request made six-to-ten days before trial was viewed as a delay tactic. Here, the request was made four days before trial. Thus, under United States v. Mackovich, his request is, as a matter of law, untimely.
 {¶ 58} During oral argument, this court interpreted Halder's attorney's argument to conclude that if Halder is competent to stand trial, he is competent to represent himself. This is a valid contention, but we are not concerned with his competency to defend pro se. The trial court was explicit that its denial of his pro se request was based on the timeliness of his request. Consequently, an otherwise competent *Page 25 
defendant may be denied the right to proceed pro se when his request is manipulative and untimely.
 {¶ 59} We are mindful that after the trial court denied the pro se request, the trial
proceeded to closure. Halder never renewed his request the next day or thereafter. We are not saying that he has to do so, but we conclude that this fact is helpful in evaluating Halder's intended use of the request, i.e., was it a sincere desire to proceed pro se or manipulative. Ultimately, we believe that this issue is within the trial court's discretion, and our review is whether the record supports the trial court's conclusion. Accordingly, we hold that Halder's request to proceed pro se was properly denied by the trial court, and his second assigned error is overruled.
 Juror Dismissal {¶ 60} In the third assigned error, Halder argues the trial court erred in dismissing a prospective juror based on her views of capital punishment. We disagree.
 {¶ 61} A prospective juror in a capital case may be excused for cause if his views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."[31] A trial court's ruling on a challenge for cause will not be overturned on appeal "unless it is manifestly *Page 26 
arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion."[32]
 {¶ 62} A review of the record in the instant case indicates that prospective Juror Number 43 initially indicated that she believed the death penalty was justified in some cases. However, when questioned further, the juror indicated that it would be difficult for her to sign a death verdict. Finally, when questioned by the trial court, the following exchange took place:
 "Juror No. 43: I am saying from a personal perspective, to say this person is going to die and sign my name to it, I don't believe I could do that.
 The Court: Under any circumstances?
 Juror No. 43: Under any circumstances."[33]
 {¶ 63} The above colloquy indicates that the prospective juror was unequivocal that she could not sign a death verdict under any circumstances. As such, the prospective juror would be unable to substantially perform her duties in accordance with the instruction and oath. Consequently, the trial court properly dismissed the juror for cause. *Page 27 
 {¶ 64} Moreover, Halder suffered no prejudice from the exclusion of the prospective juror because the death penalty was not imposed. Accordingly, we overrule the third assigned error.
 Victim Impact Evidence {¶ 65} In the fourth assigned error, Halder argues that the victim impact evidence, adduced during the guilt phase of the trial, tainted the jury with irrelevant concerns of sympathy, which rendered it more prone to convict him. We disagree.
 {¶ 66} Victim impact evidence is excluded because it is irrelevant and immaterial to the guilt or innocence of the accused — it principally serves to inflame the passion of the jury.[34] Nevertheless, the State is not wholly precluded from eliciting testimony from victims that touches on the impact the crime had on the victims: "circumstances of the victims are relevant to the crime as a whole. The victims cannot be separated from the crime."[35] In State v. Fautenberry,[36] the Supreme Court went on to say that "we find that evidence which depicts both the circumstances surrounding the commission of the *Page 28 
murder and also the impact of the murder on the victim's family may be admissible during both the guilt and the sentencing phases."[37]
 {¶ 67} With these precedents in mind, we decline to conclude that the victim impact testimony was improperly admitted. In the instant case, Halder alleges that the trial court improperly admitted the testimony of David Wallace, the brother of the slain victim. We are not persuaded.
 {¶ 68} At trial, David Wallace testified about learning of the hostage situation at Case Western. Wallace further testified about watching the news reports and seeing the body of his slain brother being taken from the building. Finally, Wallace testified about how the death of his brother had affected the entire family. Wallace's testimony comports with the law espoused in Fautenberry, because it describes the surrounding circumstances of the murder and the impact it has had on the victim's family. Consequently, the trial court properly admitted Wallace's testimony.
 {¶ 69} Halder also argues that the trial court improperly admitted parts of the testimony of twenty-eight other witnesses. Again, we are not persuaded.
 {¶ 70} A review of the record indicates that the contested testimony was properly admitted. At trial, the State presented the testimonies of twenty-eight witnesses who Halder held hostage for approximately eight hours. These victims testified about their ordeal during those eight hours. Many of the victims testified they were forced by fear *Page 29 
of death to remain in the building. Several victims testified about receiving counseling since the incident and some testified about the fear of loud noises. Many of the victims testified that they currently plan exit strategies whenever they enter a building. The foregoing testimony sheds light on the surrounding circumstances of the hostage situation and how the experience has impacted the lives of each victim. Thus, the witnesses' testimony was properly admitted.
 {¶ 71} Moreover, even if Wallace and the other witnesses had not testified, the outcome of the trial would not have been different. The record before us indicates that videotaped evidence was admitted at trial, which depicted Halder smashing his way into the building, pointing a gun at Norman Wallace, and shooting him point blank in the chest. Consequently, even if the victim impact statements were improperly admitted, there was sufficient evidence of Halder's guilt. Accordingly, we overrule the fourth assigned error.
 Diminished Capacity {¶ 72} In the fifth assigned error, Halder argues the trial court erred by not allowing him to present a claim of diminished capacity to the jury. We disagree. The defense of "diminished capacity," is not recognized in Ohio.[38] Since these assertions *Page 30 
completely lack merit, Halder's argument is rejected. Accordingly, we overrule the fifth assigned error.
Judgment affirmed.
It is ordered that appellee recover from appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANN DYKE, J., CONCUR; MARY J. BOYLE, J., DISSENTS. (SEE ATTACHED DISSENTING OPINION.)
[1] State v. Berry (1995), 72 Ohio St.3d 354, 359.
[2] (1960), 362 U.S. 402, 4 L.Ed.2d 824, 80 S.Ct. 788.
[3] Id.
[4] Berry, supra at 359, quoting Drope v. Missouri (1975),420 U.S. 162, 43 L.Ed.2d 103, 95 S.Ct. 896.
[5] State v. Vrabel (Mar. 2, 2000), 7th Dist. No. 95 CA 221.
[6] State v. Smith (2000), 89 Ohio St.3d 323, 329, 2000-Ohio-166, citing Drope, supra.
[7] R.C. 2945.37(G), see Dusky v. United States (1960), 362 U.S. 402,4 L.Ed.2d 824, 80 S.Ct. 788.
[8] State v. Kovacek (May 30, 2001), 9th Dist. No. 00CA007713, citing Godinez v. Moran (1993), 509 U.S. 389, 391,125 L.Ed.2d 321, 113 S.Ct. 2680, and State v. Bolin (1998),128 Ohio App.3d 58, 61-62.
[9] See State v. Williams (1986), 23 Ohio St.3d 16, 19, citingState v. Chapin (1981), 67 Ohio St.2d 437; State v. Bailey (1992),90 Ohio App.3d 58, 67, appeal dismissed (1992), 68 Ohio St.3d 1212,1994-Ohio-516; State v. Pruitt (1984), 18 Ohio App.3d 50, 59.
[10] State v. Hicks (1989),43 Ohio St.3d 72, 79; State v.Williams (1986), 23 Ohio St.3d 16, 19; State v. Stanley (1997),121 Ohio App.3d 673, 685-686.
[11] State v. Williams, supra.
[12] State v. DeHass (1967), 10 Ohio St.2d 230, syllabus.
[13] Dusky, supra.
[14] Tr. at 457-460.
[15] Tr. at 456.
[16] Tr. at 470.
[17] (1995), 72 Ohio St.3d 354, 362.
[18] (1986), 28 Ohio St.3d 108.
[19] Id. at 110.
[20] Tr. at 1116.
[21] Tr. at 1117-1119.
[22] Tr. at 1160.
[23] (1975), 422 U.S. 806, 95 S.Ct. 2525.
[24] Tr. at 1265.
[25] Faretta v. California (1975), 422 U.S. 806, 95 S.Ct. 2525.
[26] State v. Reed.(1996), 74 Ohio St.3d 534.
[27] 96 Ohio St.3d 94, 2002-Ohio-3751.
[28] (C.A. 4, 2005), 404 F.3d 263.
[29] (C.A.4, 2000), 204 F.3d 553 at 560.
[30] (C.A. 10, 2000), 209 F.3d 1227.
[31] State v. Leonard, 104 Ohio St.3d 54, 2004-Ohio-6235, citingWainwright v. Witt (1985), 469 U.S. 412, 424, 105 S.Ct. 844,83 L.Ed.2d 841, quoting Adams v. Texas (1980), 448 U.S. 38, 45, 100 S.Ct. 2521,65 L.Ed.2d 581. See, also, State v. Rogers (1985), 17 Ohio St.3d 174, paragraph three of the syllabus, death penalty vacated on other grounds (1985), 474 U.S. 1002, 106 S.Ct. 518, 88 L. Ed.2d 452.
[32] State v. Williams (1997), 79 Ohio St.3d 1, 8, 1997-Ohio-407; accord State v. Wilson (1972), 29 Ohio St.2d 203, 211.
[33] Tr. at 2100.
[34] See State v. White (1968), 15 Ohio St.2d 146.
[35] State v. Williams, 99 Ohio St.3d 439, 2003-Ohio-4164, P43, quoting State v. Lorraine (1993), 66 Ohio St.3d 414, 420.
[36] 72 Ohio St.3d 435, 439-440, 1995-Ohio-209, certiorari denied,516 U.S. 996, 133 L.Ed. 2d 439, 116 S.Ct. 534.
[37] Id.
[38] State v. Thomas, Cuyahoga App. No. 85968, 2006-Ohio-280. See also, State v. Wilcox (1982), 70 Ohio St.2d 182, 194; State v.Huertas (1990), 51 Ohio St.3d 22, 27.