[Cite as *State v. Buford*, 2012-Ohio-262.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 96607**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## HENRY BUFORD

DEFENDANT-APPELLANT

## JUDGMENT:
## AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-538289

**BEFORE:**     Sweeney, P.J., Jones, J., and Kilbane, J.

**RELEASED AND JOURNALIZED:**   January 26, 2012

**ATTORNEYS FOR APPELLANT**

Robert L. Tobik, Esq.
Public Defender
By: Erica B. Cunliffe, Esq.
Assistant Public Defender
310 Lakeside Avenue, Suite 200
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

William D. Mason, Esq.
Cuyahoga County Prosecutor
By: John Wojton, Esq.
      Brian D. Kraft, Esq.
      Katherine Mullin, Esq.
Assistant Prosecuting Attorneys
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

JAMES J. SWEENEY, P.J.:

{¶ 1} Defendant-appellant Henry Buford ("defendant") appeals the court's denial of his request for self-representation and his convictions for tampering with evidence and drug possession. After reviewing the facts of the case and pertinent law, we affirm.

{¶ 2} On June 2, 2010, Euclid Police Officer Greg Costello pulled defendant over near Euclid Avenue and East 204th Street for a brake light violation. Defendant made various movements while sitting in his car, which lead Officer Costello and his partner, Officer Joel Barron, to believe that defendant may have a weapon. Defendant refused to exit his vehicle, and when he eventually complied, he refused to cooperate with a pat down search. A brief struggle ensued, and both officers observed defendant put a small white

"bindle" in his mouth and swallow it. The police also saw two additional bindles drop from defendant's hand to the ground. These bindles subsequently tested positive for cocaine.

{¶ 3} On July 13, 2010, defendant was indicted for drug possession, tampering with evidence, and possession of criminal tools. On January 26, 2010, the court granted defendant's motion for acquittal regarding the possession of criminal tools charge, and a jury found defendant guilty of drug possession and tampering with evidence. On March 1, 2011, the court sentenced defendant to one year in prison for each count, to run concurrently.

{¶ 4} Defendant appeals and raises two assignments of error for our review.

{¶ 5} I. "The trial court violated Mr. Buford's Sixth and Fourteenth Amendment right to self-representation by failing to undertake a proper inquiry when Buford informed the court that he wished to represent himself."

{¶ 6} In *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶32, the Ohio Supreme Court held the following:

{¶ 7} "We have recognized that 'a defendant in a state criminal trial has an independent constitutional right of self-representation and * * * may proceed to defend himself without counsel when he voluntarily, and knowingly and intelligently elects to do so.' *State v. Gibson* (1976), 45 Ohio St.2d 366, 74 O.O.2d 525, 345 N.E.2d 399, paragraph one of the syllabus, citing *Faretta v. California* (1975), 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562. If a trial court denies the right to self-representation, when properly invoked,

the denial is per se reversible error. *State v. Reed* (1996), 74 Ohio St.3d 534, 660 N.E.2d 456, citing *McKaskle v. Wiggins* (1984), 465 U.S. 168, 177, 104 S.Ct. 944, 79 L.Ed.2d 122. To establish an effective waiver of the right to counsel, 'the trial court must make sufficient inquiry to determine whether [the] defendant fully understands and intelligently relinquishes that right.' *Gibson*, 45 Ohio St.2d 366, 74 O.O.2d 525, 345 N.E.2d 399, paragraph two of the syllabus."

{¶ 8} The *Cassano* court additionally held that "[t]he constitutional right of self-representation is waived if it is not timely and unequivocally asserted." Id. at ¶38 (citing *Jackson v. Ylst* (C.A.9, 1990), 921 F.2d 882, 888). In *Cassano*, the court reasoned that the defendant's request for self-representation, made three days before trial began, was untimely and, thus, properly denied. Id. at ¶37. Furthermore, in *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶53, the Ohio Supreme Court held that "the trial court did not abuse its discretion and properly refused appellant's request to represent himself after voir dire had been completed and on the first day that evidence was to be presented."

{¶ 9} In the instant case, defendant's request for self-representation was untimely, and evidence in the record suggests that he may have used this last minute request as a stalling technique. See *State v. Halder*, Cuyahoga App. No. 87974, 2007-Ohio-5940, ¶58 (concluding that a request for self-representation made five days before trial began was untimely and holding that "an otherwise competent defendant may be denied the right to proceed pro se when his request is manipulative and untimely"). Defendant made his

request for self-representation orally on the second day of trial. We hold that this request was untimely; thus, defendant did not properly invoke his right.

{¶ 10} Additionally, even assuming a timely request, there are numerous examples in the record that question defendant's ability to knowingly, voluntarily, and intelligently waive his right to counsel and proceed pro se.

{¶ 11} Defendant repeatedly addressed or attempted to address the court despite the court repeatedly telling defendant that, because he was represented by counsel, he must communicate to the court through his attorney. Immediatley prior to his suppression hearing, defendant told the court he was "afraid for [his] life," because the two police officers involved in his case showed up at his house. Defendant did not understand the concept of a suppression hearing and how, if his motion to suppress was denied, his trial would follow. Defendant continually insisted upon a jury trial, and the court assured defendant each time that there would be one. Defendant stated that the prescription medications he was taking were "supposed to do one thing and took me to a whole 'nother place.'" Defendant denied speaking with his attorney about his case, stating that his attorney told him "there was nothing to discuss." However, defendant's attorney told the court that he talked with defendant "at great length ad nauseam about this case."

{¶ 12} After his motion to suppress was denied, defendant attempted to change his plea to no contest under the condition that he would have "30 days and * * * come back" to court. It is unclear from the record for what defendant thought he would be coming

back to court in 30 days — an appeal, a sentencing hearing, and a jury trial were all mentioned.

{¶ 13} The court held a plea hearing and the following evidence regarding defendant's health was placed on the record: defendant did not work and he received disability; defendant denied having a "drug abuse problem," then later admitted to being a recovering heroin addict; he was taking various prescription medications including Suboxone for heroin addiction and pain medication; he took some of his medications that day but not all of them; and his medication interfered with his ability to understand the court.

{¶ 14} The court asked defendant, "[H]ave we covered all of your medications and all of your medical conditions from which you suffer currently?" Defendant replied, "What do you mean by covered?" Asked why he was having difficulty understanding the court, defendant replied, "[T]he medication that the doctor had changed me on to had disrupted my whole system. * * * I was catching the blues. I was in a bad way. Under the effects of that medication that he had changed me to." Asked if he was able to understand the court, defendant answered, "Not as well as I should be." Defendant asked the court for time "to get my head together, get myself together with the medicine that I didn't take."

{¶ 15} The court denied the change of plea and referred defendant to the psychiatric clinic for an assessment regarding transferring his case to the mental health docket. In

making this ruling, the court noted that it was "not certain whether [defendant] is having real difficulties understanding me or the process, or whether he is just being difficult."

{¶ 16} The court reconvened for defendant's trial on January 25, 2011. It was noted that the psychatric clinic reported that defendant did not suffer from any mental health issues, and his case was not eligible for transfer to the mental health court docket. Defendant requested that he be allowed to address the court regarding his attorney. Defendant again demonstrated that he was unable to effectively represent himself. For example, he complained that he never got the "paperwork" that was "necessary for a jury trial." Asked to identify specific documents, defendant eventually stated "police reports." However, defendant's attorney stated that he received full discovery from the state, he had at least four pretrials with the prosecutor, and the police report from defendant's arrest was in his hand.

{¶ 17} Additionally, defendant believed that the forensic test results concerning the bindles of cocaine he allegedly dropped were inadmissible in court because the paperwork referenced that defendant was charged with "drug trafficking" rather than "drug possession."

{¶ 18} The court denied defendant's request for discharge of his attorney and proceeded to trial. On the second day of trial, defendant asked to address the court again regarding his attorney. Defendant stated that he was afraid for his "safety and well-being" because of a conflict over money between him and his attorney. Defendant demonstrated that he did not understand the concept of "retained counsel," and he felt that

his attorney may cause him physical harm. Defendant requested that he be allowed to proceed pro se. The court once more denied defendant's request, and defendant stated the following: "My life is in danger" and "[My attorney is] pressuring me, creating an atmosphere where I can't even exist. I can barely sit beside him. You talk about continuing a trial with him. That's impossible."

{¶ 19} The court found defendant's claims to be "unbelievable" and "incredible." The court again denied defendant's request, stating that, "We started this case with counsel. * * * You do not have this right [to self-representation] at this juncture. You could have exercised your right to do that before we began."

{¶ 20} Given the totality of the circumstances, we find that defendant did not properly invoke his right of self-representation. Specifically, defendant requested to proceed pro se on the second day of trial after the state's first witness had finished testifying. Additionally, even assuming that defendant made his request in a timely manner, we find the record replete with evidence that defendant did not knowingly, voluntarily, and intelligently elect to defend himself without counsel.

{¶ 21} Accordingly, the court did not err, and defendant's first assignment of error is overruled.

{¶ 22} In defendant's second assignment of error, he argues as follows:

{¶ 23} II. "Mr. Buford was deprived of liberty without due process where his convictions for tampering with evidence and drug possession were contrary to the manifest weight of the evidence."

{¶ 24} To warrant reversal of a verdict under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.

{¶ 25} Defendant was convicted of tampering with evidence in violation of R.C. 2921.12(A)(1), which states that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]ter, destroy, conceal, or remove any * * * thing, with purpose to impair its * * * availability as evidence in such proceeding or investigation * * *."

{¶ 26} At trial, Officer Costello testified that it took defendant awhile to pull over, and defendant initially stopped his vehicle in the middle lane of traffic. After pulling over to the curb, defendant was "[a] bit nervous, maybe a little agitated. Told me he didn't know about the violation of the brake lights. I asked him a couple general questions and he seemed, you know, upset that I was talking to him." Officer Barron arrived at the scene, and Officer Costello told him to stand near defendant's vehicle and keep an eye on defendant. After Officer Costello ran defendant's information, Officer Barron reported that defendant "was moving around the vehicle, acting very nervous. He reached under the driver's seat and [Officer Barron] believed that he was trying to hide a weapon or hide some contraband."

{¶ 27} Officer Costello asked defendant to step out of his vehicle for a weapons check. Defendant asked if he was under arrest. When Officer Costello replied no, defendant refused to get out of his car and, according to Officer Costello, became hostile. The officers asked defendant to step out of his vehicle approximately five or six more times, and each time defendant refused. Eventually, defendant agreed. Before he got out of the vehicle, defendant reached into the glove box. Officer Costello believed defendant was going for a weapon. However, defendant grabbed two prescription pill bottles and got out of the car. The officers were still concerned that defendant may have a weapon on his person. Defendant had pill bottles in his left hand, and his right hand was clenched in a fist. Officer Costello told Officer Barron that defendant had something in his fist. The officers asked defendant to put his hands on the car and defendant refused.

{¶ 28} Officer Costello attempted to handcuff defendant, because "he was being difficult. * * * [W]e hadn't checked him for weapons and I didn't believe we were going to be able to check him for weapons unless he was handcuffed." Defendant struggled and resisted, and the officers took defendant to the ground to get control of him. Officer Costello testified about what happened next: "I watched him pull his right hand up towards his mouth. * * * He's going to try to put dope in his mouth. * * * He gets his hand to his mouth and something from his hand went into his mouth * * * and two items fell out of his hand and onto the grass. * * * [Defendant] attempted to swallow whatever was in his mouth."

{¶ 29} After Officer Costello watched defendant make swallowing movements with his throat, defendant "basically said, I'm done, and he relaxed and just laid there." The officers handcuffed defendant and patted him down. No weapons were found, but they recovered the items defendant threw to the ground, which were two small bindles of cocaine folded in lottery tickets. At this point, the police arrested defendant.

{¶ 30} Officer Barron's trial testimony was consistent with Officer Costello's recollection about their interaction with defendant on June 2, 2010. Officer Barron watched defendant while Officer Costello checked defendant's information. Officer Barron testified that defendant "appeared to be excessively nervous. * * * His actions — by repeatedly looking over his shoulder at me and back at Patrolman Costello, he was almost in constant motion while he sat in the seat, messing — doing something in the center console, at one point he reached underneath the driver's seat." The officers decided to check defendant for weapons, because their safety was a concern.

{¶ 31} Officer Barron heard Officer Costello ask defendant "to exit the vehicle probably five or six times. [Defendant] shook his head, asked if he was under arrest. Officer Costello said no." Defendant finally agreed to exit the vehicle but "lunged" for his glove box first, grabbing two pill bottles. According to Officer Barron, Officer Costello said that defendant had something (other than pill bottles) in his hand. Officer Barron was unable to pat defendant down because defendant was "struggling" and "not following our verbal commands." The officers took defendant to the ground. Officer Barron testified about what happened next:

{¶ 32} "We're still yelling at this guy, put your hands behind your back. Stop resisting. Stop fighting. At one point he was able to get his right hand close enough to his mouth by bringing it forward and bringing his head down and he opened his hand and kind of slid it across his mouth and I could see something white go into his mouth. * * * He's chewing and attempting to swallow whatever it was that ended up going into his mouth. * * * After he got done chewing and swallowing, his body went limp, he said, I'm done, and Officer Costello was able to get the handcuffs on him."

{¶ 33} Officer Barron also saw two white bindles fall to the ground from defendant's hand.

{¶ 34} Defendant took the stand in his defense, and testified as follows: On June 2, 2010, he was driving home on Euclid Avenue when he noticed four or five police cars engaged in a traffic stop on the other side of the street. As he drove by, one of the cars made a u-turn and got behind him with its police lights on. Defendant waited until traffic passed and pulled over in the curb lane. An officer approached defendant's vehicle, notified him about a brake light violation, and returned to the police car to run his information. The officer came back to defendan't vehicle and asked if he could search it. Defendant replied that the car was not his and he was "not at liberty to grant" permission to search it.

{¶ 35} Defendant "sensed there was going to be a problem," and began to look for his asthma inhaler and other medications. He testified that he has "super high blood

pressure with medication that [leaves him] in an agitated state." According to defendant, his breathing was "blocked," and he was "panicking."

{¶ 36} Defendant denied resisting or being uncooperative with the officers. Rather, he testified as follows about getting out of his vehicle: "I'm stumbling, I'm bumbling, I cannot reach for my cane, so they eventually take me out, and so my stumbling and bumbling could easily be taken for resisting. I'm 60 years old. How much resisting am I going to do with two young officers? I'm not suicidal."

{¶ 37} Defendant eventually got out of the vehicle, allegedly with one pill bottle in each hand. Defendant testified that the officers grabbed him and pushed him against the vehicle, which "caused my dentures, that's now in, to cut into my mouth. My mouth was bleeding, it was filled with blood, and I'm trying to empty my mouth of this blood. I also was wanting to put my medication in my mouth, but my mouth was filled with blood."

{¶ 38} According to defendant, he opened his hands when the police asked him to, and the pill bottles fell out. Additionally, he opened his mouth when the police asked him to, and the officers saw "virtually a mouthful of blood," so they did not search further. Defendant denied possessing or swallowing any drugs.

{¶ 39} Defendant's testimony was erratic and often unresponsive to the questions posed. For example, defendant repeatedly answered questions by digressing about how the bindles of cocaine must have belonged to another indivdual named Henry Buford who was charged with drug trafficking, because defendant was charged with drug possession.

Asked if it was possible that the charge against him was, at some point, changed from trafficking to possession, defendant replied that was out of the realm of possibility.

{¶ 40} Upon review, we find that there was credible testimony that defendant destroyed or concealed evidence by swallowing the bindle. Thus, defendant's conviction for tampering with evidence is not against the manifest weight of the evidence.

{¶ 41} Defendant was also convicted of drug possession in violation of R.C. 2925.11(A), which states that "[n]o person shall knowingly obtain, possess, or use a controlled substance." Defendant specifically argues that the state failed to prove chain of custody, and that the bindles of cocaine were planted evidence. In *State v. Walker*, Cuyahoga App. No. 83035, 2004-Ohio-156, ¶24, this court held that "the state has the burden of establishing the chain of custody of a specific piece of evidence. The state's burden, however, is not conclusive since 'the state need only establish that it is reasonably certain that substitution, alteration or tampering did not occur.' Even if a chain of custody is broken, it goes to the weight afforded the evidence, not its admissibility." (Internal citations omitted.)

{¶ 42} An analyst for the Ohio Bureau of Criminal Identification and Investigation testified that the Euclid Police Department submitted evidence for testing associated with defendant's case. The analyst testified that he performed the tests on the evidence shown to him at trial, and he was sure of this because he recognized his initials, which he had made across the seal at the bottom of the evidence envelope. He testified that the evidence consisted of "two paper packets, each containing a white substance. That

substance was weighed in an amount of 0.3 grams and found to contain cocaine." Asked what happens to the evidence after the tests are completed, the analyst testified as follows: "I seal it back up. All of the containers that I received it in are sealed by me, marked by me with the proper documentation. It's then placed in a locked evidence vault where it remains until the Euclid Police Department came to retrieve their evidence."

{¶ 43} Defendant presented no evidence to contradict or call into question this testimony. Accordingly, we find that the jury did not lose its way in convicting defendant of drug possession. Defendant's second assignment of error is overruled.

Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


JAMES J. SWEENEY, PRESIDING JUDGE

LARRY A. JONES, J., and
MARY EILEEN KILBANE, J., CONCUR