[Cite as *State v. Ellis*, 2020-Ohio-1115.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

STATE OF OHIO, :

    Plaintiff-Appellee, :

                                No. 108302

    v. :

RAYSHAWN L. ELLIS, :

    Defendant-Appellant. :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** March 26, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-16-607857-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Andrea Isabella, Assistant Prosecuting Attorney, *for appellee.*

Mark A. Stanton, Cuyahoga County Public Defender, and Cullen Sweeney, Assistant Public Defender, *for appellant.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Defendant-appellant, Rayshawn L. Ellis ("Ellis"), appeals from the trial court's judgment, rendered after a jury trial, finding him guilty of improperly handling a firearm in a motor vehicle, having a weapon while under disability, and

obstructing official business, and sentencing him to 36 months incarceration. For the reasons that follow, we reverse and remand.

## I.    The Trial

{¶ 2}    In 2016, Ellis and codefendant Douglas Roberts were charged in a nine-count indictment. Ellis was charged in seven counts with felonious assault (Count 2), complicity to commit felonious assault (Count 3), tampering with evidence (Count 4), two counts of improperly handling firearms in a motor vehicle (Counts 5 and 6), having a weapon while under disability (Count 8), and obstructing official business (Count 9). Counts 2 and 5 included firearm specifications. The charges rose from an incident that occurred on July 8, 2016, and involved Jovaughn Holman ("Holman"). Ellis pleaded not guilty, and the matter proceeded to a jury trial.

{¶ 3}    Holman testified that he had an on-and-off relationship with Leeanna Archer ("Leeanna"), the mother of their one-year-old daughter. He said he sometimes lived with Leeanna and sometimes with his sister, Diana Woodland.

{¶ 4}    Holman testified that Leeanna's sisters threw her a birthday party at her apartment on July 7, 2016, and he was upset that he had not been invited to the party, even though Douglas Roberts ("Roberts"), a former boyfriend of Leeanna's, had been invited. Holman testified that he showed up at the party anyway, and when he asked Roberts to leave, they got into an argument. Holman said that he then left the party and walked to Leeanna's cousin's house, which was only a few blocks away. Holman said that after a short time, Roberts, who was drunk, showed up and asked

to speak to him. Holman said that when he went outside to talk to Roberts, he noticed that Roberts had a gun in the waistband of his pants; Holman said that Roberts "kept grabbing it like he wanted me to notice it." Holman told Roberts they could talk later, and then left to go to his sister's house, which was on Arlington Avenue.

{¶ 5} Holman testified that once at his sister's house, he realized that he needed several items for his daughter, so he drove his sister's car to Leeanna's apartment to get them. Holman said that when he was at the apartment, Roberts walked over to him with a gun in his hand and asked him, "what was that stuff you were talking about?" Holman said that he "brushed it off" and walked out the back door of the apartment. He said that Roberts followed him to the parking lot, and his cousin came out to try to calm Roberts down. Holman said he then drove away.

{¶ 6} Holman testified that he and his cousin went to a mall for a short time, and he then decided to go back to his sister's house. He said that as he was waiting at a red light at the intersection of East 88th Street and St. Clair Avenue, he heard a gunshot. He said that when he opened the driver's side door and looked back, he saw a silver car one car-length behind him, and an arm extending out of the passenger side window holding a gun up in the air. Holman said that Ellis was driving the silver car and Roberts was in the front passenger seat.

{¶ 7} Holman said that he "ducked down and just took off" to his sister's house. He said he drove 35 city blocks at 60 to 70 miles per hour, running through red lights, and the silver car chased him the whole way.

{¶ 8} Leeanna testified that Holman was gone by the time she arrived at the birthday party, but that later, when she could not find her wallet and car keys, she suspected that Holman had taken them. When she asked Roberts for a ride to Holman's sister's house, he told her that Ellis had driven him to the party, and Ellis then agreed to take her. She said that Ellis drove, Roberts was in the front passenger seat, and she was in the back seat.

{¶ 9} Leeanna denied that they were "out looking for [Holman]," and said they just happened to see his car as they drove down St. Clair Avenue to his sister's house. According to Leeanna, while both cars were stopped at an intersection, Roberts unexpectedly leaned out of the passenger side window and fired two shots in the air. Leeana testified that she was shocked because she did not know that Roberts had a gun; she said she had not seen a gun at the party, and no gun was visible when she got in the car.

{¶ 10} Leeanna testified that after Roberts shot the gun, she started "going off" on him, slapping him, and asking him why he shot the gun. He replied that he was "just trying to get [Holman's] attention." Leeanna said that Ellis told Roberts to "chill; we know where he at; we're going to get him." She characterized Ellis's reaction to the shots as "normal, as in he's already aware that he had a gun * * * and he didn't seem in shock as if where did that come from." She acknowledged, however, that before Roberts shot out the window, she never saw anything to indicate that Ellis knew that Roberts had a gun.

{¶ 11} Leeanna denied that they chased Holman after the shots; she said that Holman sped away and they just continued to his sister's house. She said that Ellis did not speed after Holman nor run any red lights.

{¶ 12} Holman testified that he lost sight of Ellis's car before he reached his sister's house, and said that when he got there, he parked and went inside. He said that Ellis arrived about five to seven minutes later.

{¶ 13} Leeanna, Roberts, and eventually Ellis got out of the car and came on the lawn. According to Holman, Leeanna started yelling about him bringing out her wallet and keys. Holman stayed inside while his mother and two sisters went outside to engage Leeanna. Leeanna testified that Holman's younger sister "start[ed] going off" and punched her in the face; Holman's mother and sisters testified that Leeanna started the fight.

{¶ 14} Holman and his family testified that Roberts was "acting a fool waving the gun around," although he was not actually threatening anyone. They all agreed that Ellis "never did anything" and tried to calm things down. Holman testified that Ellis only got out of the car when Leeanna started fighting and that he was "trying to tell [Roberts], just leave, you know, just get off the property." Holman's mother testified that Ellis kept trying to get Roberts to leave, and his sister testified that Ellis tried to walk away but did not seem to want to leave without Roberts.

{¶ 15} Both Holman's sister and her daughter called 911. Cleveland police officer Ion Onofrei testified that shortly after midnight, he and his partner were

dispatched to 12701 Arlington Avenue regarding "a person with a gun * * * threatening people in that area."

{¶ 16} As the police were driving down Arlington Avenue with their sirens on and lights flashing, Ellis and Roberts got back in the car, Ellis in the driver's seat and Roberts in the passenger seat. When she saw the police coming, Leeanna fled the scene.

{¶ 17} Officer Onofrei testified that when he and his partner arrived, a female approached their car, pointed to Ellis's car, and advised them "that's the people with the gun." Officer Onofrei testified that when they pulled up behind Ellis's car, he saw Roberts toss the gun out the passenger side window. The officers exited their car with their guns drawn and ordered Ellis and Roberts out of the car.

{¶ 18} Officer Onofrei testified that the officers found no gun on Ellis when they patted him down and handcuffed him. He said the police wanted to detain Ellis in the back of a zone car while they investigated the situation, but Ellis did not want to get in the police cruiser, stating that he had not done anything wrong. Cleveland police officer Michael Boyd testified that it took the police 30-40 seconds to "push [Ellis's] hips in and control his head so we could get him to sit in the back of the car." Officer Boyd also testified that Ellis was "not very cooperative in giving us information" and did not initially give his full name and Social Security number, although he eventually did so. Officer Boyd testified further that Ellis "refused to give us fingerprints" during booking at the jail.

{¶ 19} The trial court denied Ellis's Crim.R. 29 motion in its entirety. The jury found Ellis not guilty of felonious assault (Count 2), complicity to commit felonious assault (Count 3), tampering with evidence (Count 4), and one count of improperly handling firearms in a motor vehicle (discharging a firearm while in a motor vehicle) (Count 5). The jury found Ellis guilty of the other count of improperly handling firearms in a motor vehicle (transporting a loaded firearm in a motor vehicle in a manner that the firearm is accessible to the operator or any passenger) (Count 6), having a weapon while under disability (Count 8), and obstructing official business (Count 9).

{¶ 20} The trial court subsequently sentenced Ellis to a total term of 36 months incarceration, and three years postrelease control. This appeal followed.

## II. Sufficiency of Evidence

### A. Obstructing Official Business

{¶ 21} In his third assignment of error, Ellis contends that his conviction for obstructing official business in violation of R.C. 2921.31(A) was not supported by sufficient evidence because the failure to provide one's fingerprints upon the request of police is not an affirmative act that would support a conviction under R.C. 2921.31(A)

{¶ 22} As an initial matter, we reject the state's contention that Ellis waived this argument for purposes of appeal because defense counsel did not raise the argument at trial, and argued only that Ellis had not obstructed official business because he eventually gave his name and Social Security number to the police and

thus did not impede their investigation. "The prosecutor must prove each and every element of the offense beyond a reasonable doubt," *State v. Carter*, 64 Ohio St.3d 218, 223, 594 N.E.2d 595 (1992), citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and a conviction based on legally insufficient evidence is a denial of due process. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). Thus, a defendant's not guilty plea preserves his right to object to the insufficiency of the evidence on appeal. *State v. Jones*, 91 Ohio St.3d 335, 346, 744 N.E.2d 1163 (2001), citing *Carter* at *id.* Consequently, waiver is inapplicable to an insufficiency argument and, accordingly, we will consider Ellis's argument.

{¶ 23} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 24} Ellis was convicted of obstructing official business in violation of R.C. 2921.31(A), which provides that

[n]o person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within his official capacity, shall do any act which hampers or impedes a public official in the performance of his lawful duties.

This provision has five essential elements: (1) an act by the defendant, (2) done with the purpose to prevent, obstruct, or delay a public official, (3) that actually hampers or impedes a public official, (4) while the official is acting in the performance of a lawful duty, and (5) the defendant so acts without privilege. *Brooklyn v. Kaczor*, 8th Dist. Cuyahoga No. 98816, 2013-Ohio-2901, ¶ 7.

{¶ 25} As this court has recognized, "[t]o prove the crime of obstructing official business, there must be proof of an affirmative or overt act that hampered or impeded the performance of the lawful duties of a public official." *Id.* at ¶ 8, citing *Parma v. Campbell*, 8th Dist. Cuyahoga Nos. 79041 and 79042, 2001 Ohio App. LEXIS 4907 (Nov. 1, 2001). "'One cannot be guilty of obstructing official business by doing nothing because the text of R.C. 2921.31 specifically requires an offender to act.'" *Id.*, quoting *State v. Brickner-Latham*, 3d Dist. Seneca No. 13-05-26, 2006-Ohio-609, ¶ 26. Thus, the "[m]ere failure to obey a law enforcement officer's request" does not bring a defendant "within the ambit of this offense." *Cleveland Hts. v. Lewis*, 187 Ohio App.3d 786, 2010-Ohio-2208, 933 N.E.2d 1146, ¶ 37 (8th Dist.). Consequently, a defendant's refusal to provide his driver's license to an officer on request, or the refusal to answer a police officer's questions regarding one's identity cannot support a conviction for obstructing official business. *Kaczor* at *id.*, citing *Middletown v. Hollon*, 156 Ohio App.3d 567, 2004-Ohio-1502, 807

N.E.2d 945, ¶ 32 (12th Dist.) and *Cleveland Hts. v. Lewis*, 187 Ohio App.3d 786, 2010-Ohio-2208, 933 N.E.2d 1146, ¶ 37 (8th Dist.).

{¶ 26} Likewise, a defendant's refusal to be fingerprinted cannot support a conviction for obstructing official business. *State v. Justice*, 4th Dist. Pike No. 99CA631, 1999 Ohio App. LEXIS 5779, 13 (Nov. 16, 1999). The refusal to provide fingerprints at the request of the police at booking merely constitutes a failure to act, which is not criminalized by R.C. 2921.31. *State v. Muldrow*, 10 Ohio Misc.2d 11, 12, 46 N.E.2d 1177 (1983).

{¶ 27} Here, Ellis performed no affirmative act that would be sufficient to constitute an affirmative act that hindered the police investigation for purposes of R.C. 2921.31(A). He merely failed to comply with a request to provide his fingerprints. His refusal to provide his fingerprints cannot constitute a violation of R.C. 2921.31(A). Accordingly, his conviction for obstructing official business in violation of R.C. 2921.31(A) was not supported by sufficient evidence.

{¶ 28} The state contends that it produced evidence that Ellis's alleged obstruction involved refusing to get in or sit in the police cruiser. But the state never made this argument in the trial court. Neither the indictment nor the bill of particulars alleged a particular act by Ellis that constituted obstruction. In its opening and closing argument, the state's only argument regarding Ellis's alleged obstruction was his failure to submit to fingerprinting. (Tr. 155, 445.) Likewise, in its argument opposing Ellis's Crim.R. 29 motion for acquittal, the state argued that Ellis obstructed official business because he failed to provide his fingerprints:

> And lastly as it regards to the obstructing official business count, Officer Boyd indicated that even though they already had identified him via Social Security number and full name, that part of the process with Cleveland CPU is that they need fingerprints, and that is typical protocol, and he wasn't willing to cooperate with them. They later at another time had to then obtain his fingerprints, hence, obstructing their ability to complete their tasks.

(Tr. 392.)

{¶ 29} The state's only argument throughout the case regarding Ellis's alleged obstruction involved his failure to submit to fingerprinting, and was the only conceivable basis for the jury's verdict. Assuming, without deciding, that the state can now shift its argument on appeal to maintain its conviction on other grounds, we still find insufficient evidence to support a conviction for obstructing official business. Indeed, in *State v. Simpson*, 82 Ohio App.3d 286, 611 N.E.2d 892 (8th Dist.1992), this court held that a defendant's mere "refusal to get into the [police] cruiser" does not constitute an affirmative "act to impede the police" as required by R.C. 2921.31. *Id.* at 292.

{¶ 30} Accordingly, the third assignment of error is sustained. Because there was insufficient evidence to support Ellis's conviction for obstructing official business in violation of R.C. 2921.31(A), the conviction on this count is vacated.

## B. Having A Weapon While Under Disability

{¶ 31} In his second assignment of error, Ellis contends that his conviction for having a weapon while under disability is not supported by sufficient evidence.

{¶ 32} Ellis was convicted of violating R.C. 2923.13(A)(2), which prohibits any person from knowingly acquiring, having, carrying, or using any firearm if he

has been convicted of any felony offense of violence. Although Ellis conceded at trial that he had such a prior conviction, he contends that the evidence was insufficient to establish that he constructively possessed Roberts's gun.

{¶ 33} The state conceded at trial that Ellis did not ever "handle or touch" Roberts's gun; thus, it conceded that Ellis did not acquire, carry, or use the firearm. In order to "have" a weapon within the meaning of R.C. 2923.13(A), one must either actually or constructively possess it. *State v. Adams*, 8th Dist. Cuyahoga No. 93513, 2010-Ohio-4478, ¶ 16. Because Ellis never actually possessed the gun, to convict him of the offense, the state had to present evidence that he constructively possessed Roberts's gun.

{¶ 34} Constructive possession exists when an individual exercises dominion and control over an object, even though the object may not be within his immediate physical possession. *State v. Gardner*, 8th Dist. Cuyahoga No. 104677, 2017-Ohio-7241, ¶ 34, citing *State v. Wolery*, 46 Ohio St.2d 316, 329, 348 N.E.2d 351 (1976). To establish constructive possession, there must be some evidence that the person exercised or had the power to exercise dominion and control over the object. *Gardner* at ¶ 35. It must also be shown that the person was "conscious of the presence of the object." *Id.*, citing *State v. Hankerson*, 70 Ohio St.2d 87, 91, 434 N.E.2d 1362 (1982).

{¶ 35} Whether a person under disability knowingly had, carried, or used a firearm is to be determined from "all the attendant facts and circumstances available." *State v. Bray*, 8th Dist. Cuyahoga No. 92619, 2009-Ohio-6461, ¶ 21.

Although constructive possession of a firearm may be established by reasonable inferences from circumstantial evidence, it cannot rest upon mere speculation. *Gardner* at *id.*, citing *State v. Washington*, 8th Dist. Cuyahoga Nos. 98882 and 98883, 2013-Ohio-2904, ¶ 22, and *State v. Haynes*, 25 Ohio St.2d 264, 270, 267 N.E.2d 787 (1971).

{¶ 36} Ellis contends there was insufficient evidence to support his conviction because there was no evidence he was even aware Roberts had a gun until Roberts fired it out of the car. He further contends there is no indication that anyone other than Roberts exercised any dominion or control over the gun after Roberts fired it. Ellis asserts that Roberts was waving the gun around in the air at Holman's sister's house while he tried to diffuse the situation, and that Roberts threw the gun out the passenger window of the car when the police pulled behind the car. Ellis contends that Roberts, and only Roberts, had physical possession of the gun throughout the events of the evening, and that he never exercised any dominion or control over the gun.

{¶ 37} The state would have us find constructive possession based on Ellis's alleged knowledge that he knew the gun was inside the car when he, Roberts, and Leeanna were driving to Holman's sister's house. The state notes that Leeanna testified that Ellis's reaction after Roberts shot the gun from the car was "normal, as in he's already aware that he had a gun, like he already knew." It argues further that even after Roberts shot the gun in the air, Ellis kept chasing Holman at 65-70 miles per hour for approximately 35 city blocks. The state further contends that two or

more persons may have joint possession of the same object, and because Ellis was in such close proximity to Roberts's gun while they were in the car, he had access to it and, therefore, had constructive possession of the gun.

{¶ 38} This case admittedly presents a close call. Nevertheless, we are not persuaded by the state's arguments. Leeanna testified that she saw nothing before Roberts shot the gun out the car window to indicate that Ellis knew that Roberts had a gun and further, that Ellis did not chase Holman after Roberts shot the gun. Her testimony that Ellis somehow "already knew" about the gun before Ellis fired it out the window because of his allegedly "normal" reaction to the shots is speculation.

{¶ 39} Furthermore, there is no evidence to suggest that Ellis had access to the gun while he was driving Roberts and Leeanna to Holman's sister's house, even after Roberts shot it out the window. Instead, all of the evidence at trial was that Roberts, and only Roberts, carried the gun the entire evening — either in his pants or his hands — and there is no evidence whatsoever that the gun ever left Roberts's physical possession while he rode in Ellis's car. At most, the state's evidence established that Ellis was in the vicinity of the gun, which is not sufficient to establish constructive possession. *Gardner*, 8th Dist. Cuyahoga No. 104677, 2017-Ohio-7241 at ¶ 45.

{¶ 40} In *State v. Carson*, 8th Dist. Cuyahoga No. 104998, 2017-Ohio-7243, the defendant argued there was insufficient evidence to support his conviction on a firearm specification in violation of R.C. 2941.141, which imposes an additional one-year prison term when "the offender had a firearm on or about the offender's person

or under the offender's control while committing the offense." The defendant asserted there was insufficient evidence to support his conviction because even though a firearm was discovered in the car he was driving when he was arrested, the gun was not found on his person and was not within his immediate reach as the driver. *Id.* at ¶ 21. This court noted that a defendant's mere presence in an area where an object is located does not conclusively establish constructive possession, but "this presence, 'coupled with another factor probative of dominion and control, may establish constructive possession.'" *Id.* at ¶ 18, quoting *State v. Cooper*, 3d Dist. Marion No. 9-06-49, 2007-Ohio-4937, ¶ 26. This court found that the defendant's attempt to flee led to a natural inference that he was aware of the gun's presence, and his flight and the additional time used in fleeing, coupled with the furtive actions of the passenger behind him and the subsequent discovery of the gun directly behind this passenger, established that the defendant knowingly exercised dominion and control over the firearm. *Id.* at ¶ 26.

{¶ 41} But in this case, there is not "another factor" probative of Ellis's alleged dominion and control over Roberts's gun to couple with his presence near the gun. There is no evidence that Ellis ever reached for the gun, demanded it from Roberts, spoke to Roberts about it, or tried to hide it from the police. In short, there is no evidence to establish that other being near the gun, Ellis ever had or was able to exercise any dominion and control over the firearm.

{¶ 42} Accordingly, the second assignment of error is sustained. Because there was insufficient evidence to support Ellis's conviction for having a weapon

while under a disability in violation of R.C. 2923.13, the conviction on this count is vacated.

### III. The Trial Court's Denial of Ellis's Right to Self-Representation

{¶ 43} Ellis was arrested in July 2016, and held in pretrial custody for more than seven months. His trial was first set in November 2016 but was continued on six occasions for reasons outside of his control (witness unavailability, trial court unavailability, defense counsel's illness).

{¶ 44} On February 13, 2017, before commencing trial, the trial court reviewed the charges against Ellis and the possible penalties if he were found guilty. After advising Ellis that he had a lengthy criminal history, was facing a lot of time, and that Roberts was willing to testify against him, the judge asked Ellis if he had considered a plea. Ellis responded that he had considered a plea but had to "respectfully decline" because "I am an innocent man and looking for justice today." When Ellis told the judge that he might testify at trial, the judge advised him that if he did, the jury would find out about his criminal record.

{¶ 45} The trial judge then told Ellis about a recent trial in which the defendant, who like Ellis said she was innocent and wanted justice, rejected a four-year plea agreement in a murder case, went to trial, and was convicted of life in prison without the possibility of parole. The judge then told Ellis that if he were convicted by a jury, he could be in prison until age 63. The judge also told Ellis that he should be aware that the jury would be instructed on the concept of conspiracy,

the same instruction that caused the defendant in the recent murder trial to be found guilty. The judge also told Ellis that he "regarded [him] to be a bad actor."

{¶ 46} The judge then again asked Ellis if he should consider pleading guilty, to which Ellis responded, "I don't feel like I could get a fair trial in this courtroom." Ellis told the court that he had "been here for seven months," that his "speedy trial rights have been violated," and that "all I want to do is go home." The trial court told Ellis that he would only go home if he were found not guilty, which he should not expect. Ellis then told the court "this is a mock trial," he did not think he could "get a fair trial in this courtroom," and that "it seemed like this trial [is] going to go whichever way you all say it is going to go anyway."

{¶ 47} The judge told Ellis he was speaking "gobbledegook nonsense" and then asked the prosecutor if the state was prepared to go forward. The prosecutor indicated that the state was prepared for trial, but asked that Counts 2 and 3 be nolled because "the victim on those counts [i.e. Holman] is MIA." The court refused to dismiss the two counts, and said he would sign a bench warrant for Holman's arrest and continue the trial. Ellis complained that several arrest warrants had already been issued for Holman's arrest, and that he was unwilling to consent to any further continuance. The trial court nevertheless continued the trial. Significantly, defense counsel did not challenge any of the trial court's statements to Ellis during the court's colloquy with him, nor its decision to again continue the trial. Also significantly, upon questioning from the judge, Ellis stated that he would not waive a jury trial on the having a weapon while under disability counts and the notice of

prior conviction and repeat violent offender specifications, despite the judge's admonition that the jury would then learn about Ellis's prior convictions.

{¶ 48} Eight days later, on the day of trial, February 21, 2017, defense counsel told the court that Ellis wanted to represent himself, wanted time to research legal issues he believed his counsel had not adequately researched, and wanted the trial judge to recuse himself "because he doesn't feel that he can get a fair trial." Defense counsel also informed the court that despite his efforts, Ellis was unwilling to waive his right to a jury trial on the having a weapon while under a disability counts and notice of prior convictions and repeat violent offender specifications.

{¶ 49} The trial court ignored the request for recusal and engaged in a colloquy with Ellis about his education and ability to represent himself. The judge asked Ellis about his age, educational background, intelligence, and ability to comprehend. The judge then asked Ellis to agree that he had "a lengthy, troubling criminal record." When Ellis told the judge that "a lot of things that you may see on the record, a lot of them really can't be held against me because I actually got tricked into copping out, as I see a lot of my brothers and sisters do it every day," the judge said, "Okay, I see where this could go," and summarily denied Ellis's motion to represent himself, stating that the court would not entertain an oral motion and the motion was "out of time."

{¶ 50} The court then asked if there were any other issues that needed to be addressed prior to trial. Ellis then stated that he did not mind keeping his defense

counsel, but still wanted to research "some things for myself because I see how this court is going and, you know, this is all — it's a lot of discrepancies." When the judge asked what the discrepancies were, Ellis responded that '[t]here's not a piece of evidence that proves that I'm guilty of any crime." The trial court responded that Ellis could "tell this to a jury" to "convince them," but "[y]ou're never going to convince me, because I know who you are. I know your record."

{¶ 51} The trial court then reminded Ellis about the defendant who had recently rejected a plea deal, was found guilty of murder, and is now serving a life sentence. When Ellis told the judge that case had nothing to do with him, the judge told him he could serve 23 years on the first count alone, and that in light of his record, he would serve a lengthy sentence if he went to trial and was found guilty.

{¶ 52} The judge then reiterated to Ellis that he was not going to represent himself because he had not filed a motion, and that the case was not going to be delayed again because Holman had been arrested since he would not come in on his own to testify.

{¶ 53} In his third assignment of error, Ellis contends that the trial court committed reversible error when it denied his request to represent himself.

{¶ 54} Criminal defendants enjoy the constitutional right to self-representation at trial provided that the right to counsel is knowingly, voluntarily, and intelligently waived after sufficient inquiry by the trial court. *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 89. The right is not absolute, however. A criminal defendant must "unequivocally and explicitly" invoke

his right to self-representation. *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 38. In addition, the request must be timely. *Id.* Where the request is timely and explicitly made, the denial of the request is per se reversible error. *State v. Thigpen*, 8th Dist. Cuyahoga No. 99841, 2014-Ohio-207, ¶ 23.

{¶ 55} Self-representation may be properly denied when requested in close proximity to trial or under circumstances indicating that the request is made for purposes of delay or manipulation. *State v. Armstrong*, 8th Dist. Cuyahoga No. 103088, 2016-Ohio-2627, ¶ 9, citing *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 50.

{¶ 56} It is apparent that Ellis unequivocally and explicitly invoked his right to self-representation on February 21, 2017. The issue is whether his request was timely. The state contends that Ellis's request was "untimely and essentially a manipulative tactic to delay trial" because Ellis never asked to represent himself prior to February 21, 2017, immediately prior to trial, even though the case had been pending for seven months.

{¶ 57} We find nothing manipulative or untimely about Ellis's request, even though it was made on the day of trial. First, although the trial court stated that it was denying the request as untimely, it is apparent that was not the real reason for its denial. When the trial court was informed that Ellis wanted to represent himself, the court did not immediately deny the request as untimely. Rather, the judge began a colloquy with Ellis to assess his ability to represent himself. The judge quickly became irritated with Ellis's assertions about the fairness of the criminal justice

system, however; said he "saw where this could go," and denied Ellis's right to personally present his defense by using the pretext of untimeliness. The judge's disagreement with Ellis's view of the criminal justice system, however, is not a permissible basis for denying his right to represent himself.

{¶ 58} Furthermore, we do not find that the request was made for the purpose of delay. If Ellis had caused ongoing delays of the trial through frequent requests for continuances, changes in counsel, or frivolous motions, there would be a basis for concluding his request for self-representation was merely another delay tactic. *See, e.g., State v. Lozada*, 8th Dist. Cuyahoga No. 94902, 2011-Ohio-823 (day of trial request untimely, particularly given the history of delays in the case caused by the defendant). But Ellis had not done so. In fact, the delays in the case and continuance of the trial date were attributable almost entirely to the state, and even before he made his request for self-representation, Ellis had complained bitterly about the delay that had already occurred in his case. Indeed, Ellis had strenuously objected when only eight days earlier, the trial court had continued the trial again despite Ellis's objection that the trial had been continued many times already, and his assertion that he would not consent to another continuance.

{¶ 59} It is apparent that Ellis's decision to represent himself came about because only eight days earlier, the trial judge had pressured him to plead guilty, to the point where Ellis told the court he did not feel like he could get a fair trial, and it "seemed like this trial [is] going to go whichever way you all say it is going to go anyway." Most significantly, Ellis's counsel offered no objection whatsoever to any

of the trial court's comments during the hearing on February 13, 2017, nor any assistance to Ellis. Having been subjected to the judge's unrelenting pressure with no protection or assistance from counsel, it is not surprising that Ellis asked to represent himself.

{¶ 60} Ellis also asked that the trial judge recuse himself (which the court never addressed), a request that supports our conclusion that Ellis's request to proceed pro se was not made for the purpose of delay. At the hearing on February 13, 2017, after engaging in an extended colloquy with the judge, Ellis told the trial court that he did not believe he could get a fair trial. He also told the judge that he would not waive a jury trial on the having a weapon while under disability counts and notice of prior conviction and repeat violent offender specifications. Despite counsel's advice between that hearing and the day of trial, Ellis did not change his mind about the waiver. Ellis's refusal to waive a jury trial on these counts and specifications supports his earlier statement that he felt — whether rightly or wrongly — that he would not receive a fair trial.[1] His request to represent himself, although made on the day of trial, was not made for purposes of delay; it was Ellis's attempt to help himself secure a fair trial.

{¶ 61} Nor do we find Ellis's statement after the court denied his request to proceed pro se that he didn't "mind keeping [his lawyer], if he wants to work, but I

---

[1] The trial judge's statement to Ellis immediately before trial that Ellis could never convince the judge that he was innocent "because I know who you are" is extremely troubling, especially given Ellis's earlier assertion that he felt he could not "get a fair trial in this courtroom."

need to get into the law library for myself," to indicate that his request to represent himself was not sincere and made for the purpose of delay. Given that the trial court had denied his preferred option of representing himself, Ellis's willingness to keep his previously assigned attorney, rather than seeking a new one, demonstrates his desire *not* to unnecessarily delay the trial.

{¶ 62} The dissent makes much of the fact that this was a delayed appeal, asserting that the majority's "reliance" on Ellis's "professed 'innocence'" and "distaste for the justice system" is misplaced given Ellis's acknowledgement at sentencing and the hearing on his motion for judicial release of his criminal responsibility. The dissent misunderstands the majority's position. We do not rely on Ellis's protestations of innocence and his "distaste for the justice system" to find he was denied his right to self-representation. Rather, we find that Ellis's request was unequivocally and timely made, and it was therefore structural error for the trial court to deny his request.

{¶ 63} Furthermore, this appeal was delayed because the judge encouraged Ellis at sentencing to file a motion for judicial release and strongly hinted he would grant it. (Tr. 519.) At the hearing on the motion, the trial judge denied the motion, finding — contrary to the dissent's assertion — that Ellis had not accepted responsibility for any criminal conduct. (Tr. 580-581.)

{¶ 64} The trial court's denial of Ellis's motion to represent himself denied Ellis his constitutional right to self-representation, a structural error that requires

reversal of Ellis's remaining conviction for improperly handling a firearm in a motor vehicle. We reverse and remand for a new trial on this count only.

{¶ 65} Reversed and remanded.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

MARY EILEEN KILBANE, P.J., CONCURS IN JUDGMENT ONLY;
SEAN C. GALLAGHER, J., CONCURS IN PART AND DISSENTS IN
PART WITH SEPARATE OPINION

SEAN C. GALLAGHER, J., CONCURRING IN PART AND DISSENTING IN
PART:

{¶ 66} Although I agree with the lead opinion's resolution of the assigned error with respect to the obstruction charge, I dissent from the remainder of the opinion. There are two primary issues that must be addressed, the decision vacating the conviction for having a weapon while under disability and the decision to remand the improper handling of a firearm count for a new trial.

**Having a Weapon While Under Disability**

{¶ 67} With respect to the having a weapon while under disability conviction, there appears to be some confusion as to the elements upon which Ellis was found guilty. Under R.C. 2923.13(A), "no person shall knowingly acquire, have, *carry* or use any firearm" while under disability as defined under subdivisions (A)(1) through (5) of that section. (Emphasis added.) *Id.* The alternative means of committing the offense are stated in the disjunctive — the state need only prove one of the means to secure a conviction. In his brief, Ellis focuses on whether he actually or constructively possessed a firearm on the day in question, to the exclusion of the remaining alternative means of committing the offense. This implicates the "having" component of committing the offense, "[t]o 'have' a weapon under disability requires either actual or constructive possession." *State v. Moore*, 9th Dist. Summit No. 28792, 2019-Ohio-1872, ¶ 10, citing *State v. Hardy*, 60 Ohio App.2d 325, 327, 397 N.E.2d 773 (8th Dist.1978). The focus on the constructive possession issue ignores the alternative means of proving the crime. *State v. McKinney*, 8th Dist. Cuyahoga No. 106377, 2019-Ohio-1118, ¶ 33 ("In reviewing an alternative means case, the [appellate] court must determine whether a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt."). We cannot arbitrarily focus on a single means of proving the crime to the exclusion of an alternative that could have been the basis of the conviction.

{¶ 68} In charging the jury, the trial court defined the term "carry" to mean "to take from one place to another, to transport." There were no objections to that instruction at trial or in this appeal and, as a result, Ellis has waived any errors therein. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 191, citing *State v. Underwood*, 3 Ohio St.3d 12, 444 N.E.2d 1332 (1983), syllabus. The evidence demonstrated that Ellis, by driving off after the shooting with the codefendant in the vehicle, knowingly transported the firearm from one place to another. There is no possession component to transporting the firearm as the jury was instructed. This conclusion is also consistent with the fact that the jury found Ellis guilty of improper handling of a firearm in a motor vehicle. The inquiry should end here based on the limited argument presented for our review. App.R. 16(A)(7).

{¶ 69} Even if the constructive possession means of committing the offense were considered, Ellis's argument is still without merit. With respect to the mens rea that Ellis knowingly carried or possessed the firearm, there is a reasonable inference that Ellis was aware of the codefendant's possession of a firearm based on his observed lack of response to the shooting — Ellis did not appear surprised by the codefendant's conduct. This is not speculation. The witness is permitted to testify about her observations of Ellis's conduct and her reaction to the same. From there, the jury is free to draw reasonable conclusions. There is also evidence that the codefendant reentered Ellis's vehicle with the firearm after the incident at Holman's home. From the evidence presented at trial, it is reasonable to conclude that Ellis was aware of the presence of the firearm because of his observed lack of surprise at

the shooting. *See, e.g., State v. Carson*, 8th Dist. Cuyahoga No. 104998, 2017-Ohio-7243, ¶ 26 (reasonable inference from observations of the defendant's actions regarding knowledge of the firearm is sufficient evidence of guilt); *State v. Scott*, 8th Dist. Cuyahoga No. 77461, 2001 Ohio App. LEXIS 5792, 20 (Dec. 14, 2001) (reaching a similar conclusion).

{¶ 70} The lead opinion's discussion addressing Ellis's alleged dominion and control over the firearm through the codefendant, for the purposes of the constructive possession element of the crime, stems from its sua sponte review of the record and its unilateral discussion of relevant legal authority. Ellis has not cited any authority in support of the lead opinion's conclusion, nor has he even discussed whether his actions constituted dominion and control over the firearm as contemplated under the constructive possession doctrine.

{¶ 71} Ellis's sole argument is that he lacked foreknowledge of the weapon for the purposes of constructive possession. The state has never been presented with an opportunity to address Ellis's dominion and control over the firearm for the purposes of constructive possession. Appellate courts have been continually admonished to "not decide cases on the basis of a new, unbriefed issue without 'giving the parties notice of its intention and an opportunity'" to respond. *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888, ¶ 21; *State v. 1981 Dodge Ram Van*, 36 Ohio St.3d 168, 170, 522 N.E.2d 524 (1988). To rule in this fashion deprives the state of any opportunity to address what is now considered dispositive.

{¶ 72} Although neither party discusses the constructive possession issue outside the foreknowledge aspect, it should be noted that this court has concluded that constructive possession may be "achieved by means of an agent." *In re J.H.*, 8th Dist. Cuyahoga No. 85753, 2005-Ohio-5694, ¶ 29, quoting *State v. Ridley*, 10th Dist. Franklin No. 03AP-1204, 2005-Ohio-333. In other words, an accomplice can constructively possess a firearm by exercising dominion and control over another who does possess the firearm. *Hardy*, 60 Ohio App.2d 325, at 327, 397 N.E.2d 773; *State v. Dalmida*, 1st Dist. Hamilton No. C-140517, 2015-Ohio-4995, ¶ 16.

{¶ 73} I acknowledge that it is debatable whether Ellis's actions arise to that level based on the facts of this case, but in light of the fact that neither party has addressed this component of a constructive possession claim, the issue has been waived for the purposes of appellate review. *State v. Wintermeyer*, Slip Opinion No. 2019-Ohio-5156, ¶ 19. Appellate courts should not be required to create and advocate legal positions on the behalf of the parties. Appellate decisions are best formed in the crucible of advocacy, not from the sua sponte review of issues that may not consider all aspects of the issue or the law. In light of the foregoing, and after taking all reasonable inferences in favor of the state as we are required to do under the sufficiency standard, there is sufficient evidence to support the having a weapon while under disability conviction.

**Improper Handling of a Firearm**

{¶ 74} I also disagree with the decision to reverse the improper handling of a firearm charge for a new trial based on the failure to permit Ellis to represent

himself at the trial, which ended with an acquittal on the most serious charges he faced. It is important to remember that this is a delayed appeal. Although we treat delayed appeals as if they were timely filed, we cannot ignore the fact that between the time of Ellis's conviction and this appeal, Ellis announced that he understood the jury's conclusion and accepted responsibility for his misconduct during the sentencing hearing and at the time of his requests for judicial release. Any reliance on Ellis's professed "innocence" and distaste for the criminal justice system during his pretrial invocation of his right to self-representation, as Ellis asks us to consider, rings hollow given his later concessions and acceptance of criminal responsibility. Tr. 510:4-516:3; tr. 545:1-15 (first hearing on judicial release).

{¶ 75} On this point, it must also be noted that the trial court, during the sentencing hearing, did not "strongly hint" that a motion for judicial release would be granted. Instead, the court merely indicated a belief in the sincerity of Ellis's acceptance of responsibility for his conduct in the underlying matter, and based on that sincerity, the court would "consider" judicial release if a motion were later filed. Tr. 519:17-23 ("If you have a motion [for judicial release], you have an option after you've been there for six months to file. I'll consider you for judicial release *because of the attitude that you have demonstrated here today*, the awareness, the enlightenment." (Emphasis added.)).

{¶ 76} During the second hearing on Ellis's motion for judicial release, Ellis indeed retracted some of his former self-contemplative statements, tr. 564:1-566:19, but nonetheless reminded the court of the sincerity of his sentencing remarks. Tr.

577:11-18. The trial court then walked through Ellis's extensive criminal history with Ellis taking opportunities to profess his innocence to several of the charges to which he pleaded guilty in the other cases. Tr. 579:2-14. The trial court ultimately rejected Ellis's bid for early release, concluding, based on the statements made during the second hearing, that Ellis's acceptance of responsibility was not entirely sincere as it had been presented at the sentencing and first judicial release hearings (which was continued for the purpose of obtaining an institutional report). Tr. 580:5-25.

{¶ 77} Regardless, the bulk of the dialogue the lead opinion questions with respect to the issues in this appeal has nothing to do with self-representation. For example, while discussing the plea offer on the record more than a week before trial commenced, the trial court noted that if Ellis persisted with his decision to try the having a weapon while under disability count to the jury, the jury would hear of Ellis's prior convictions, and that because of Ellis's record, the court would be hard-pressed to finding him not guilty of the RVO specification if the jury returned a guilty verdict on the underlying charges. Although arguably ill-advised, the court later retracted that statement:

> and by the way, you do have a right to have the RVO and having weapon while under disability tried to the court. You've rejected that and you said some disrespectful things, but I'll forgive you and let you do that again if you want to because its very prejudicial to let them [the jury] know that you're an RVO, repeat violent offender, prior to trial.

Tr. 31:24-32:5.

{¶ 78} The trial court did not misstate the law or the practical effects of Ellis's then-pronounced decisions. This explains why Ellis's counsel declined to interpose

objections — there was no basis for such an objection. At that time, Ellis maintained that he was innocent of the charges because he was not an active participant in the codefendant's crimes. It was in that context that the trial court informed Ellis that the legal definition of conspiracy vastly differed from Ellis's notion of innocence, and the trial court explained its most recent experience with an offender who misconstrued the nature of a conspiracy charge in the same fashion, which resulted in the offender serving 63 years in prison instead of the four or so years the state had offered her before trial.

{¶ 79} Not all defendants understand the legal definition of conspiracy under Ohio law, and Ellis clearly demonstrated that his professed understanding of innocence was misplaced. Although the line between pressuring an offender into pleading guilty and fully informing the offender of the consequences of a decision is a fine one, chastising a court for correcting a defendant's misconceptions will do nothing but impose a chilling effect on trial courts attempting to explain complex legal proceedings in simple-to-understand terms. And regardless, any issues with the trial court's plea proceeding is independent of any errors in the ensuing trial process. In fact, the remedy for a trial court's unwarranted exertion of pressure on a defendant to plead guilty is to vacate the conviction and permit the offender to withdraw the guilty plea. *State v. Byrd*, 63 Ohio St.2d 288, 294, 407 N.E.2d 1384 (1980).

{¶ 80} Instead of being forced into a plea, Ellis made an informed decision to take the matter to trial, in which he was afforded a full and fair process. Tellingly,

the lead opinion cites no portion of the trial warranting any concern. Despite the tone of the pretrial dialogue, the trial court appears to have conducted a fair and balanced proceeding — in fact, no one is arguing to the contrary. Ellis's attorney exhibited skill and professionalism that resulted in Ellis being acquitted on the most serious charges. Finally, the trial judge did not unduly punish Ellis at sentencing because of his decision to decline the plea offer — the sentences were imposed to be concurrently served — again, there is no objection to the imposed sentences that have been fully served at this point in time.[2]

{¶ 81} Regardless, the real issue in this appeal has nothing to do with the trial judge's tone or commentary relative to the plea offer: it is the lead opinion's use of that dialogue to resolve a separate issue — namely Ellis's equivocal and untimely invocation of his constitutional right to self-representation.

{¶ 82} Requests for self-representation must be both unequivocal *and* timely. *State v. Townsend*, 8th Dist. Cuyahoga No. 107186, 2019-Ohio-1134, ¶ 20, citing *State v. Halder*, 8th Dist. Cuyahoga No. 87974, 2007-Ohio-5940, ¶ 50. Ellis's invocation was neither. Anything between six to ten days before trial has been deemed presumptively "untimely." *Id.* at ¶ 19, citing *United States v. Mackovich*, 209 F.3d 1227, 1237 (10th Cir.2000), and *United States v. George*, 56 F.3d 1078, 1084 (9th Cir.1995); *State v. Castellon*, 8th Dist. Cuyahoga No. 106813, 2019-Ohio-628, ¶ 51. Ellis's request first proffered on the day of trial is not even pushing the

---

[2] The three-year aggregate term of imprisonment imposed in March 2017 included 265 days of jail-time credit.

boundaries of that presumption and to conclude otherwise creates a conflict with decisions from this district and the Ohio Supreme Court.

{¶ 83} As the lead opinion notes, Ellis asked to represent himself on the day of trial for the express purpose of researching legal issues he believed his counsel had not adequately researched. Contrary to an express invocation, Ellis also expressed a desire to keep his defense counsel and he only sought to represent himself because he wanted access to the case file and the right to be in the law library. Ellis's self-professed goal was to delay the trial while retaining his court-appointed counsel. This alone demonstrates that Ellis's invocation of his right to self-representation was *equivocal* — no defendant has a right to represent himself concurrently with trial counsel. There is no error here, legal or otherwise. Courts must deny such a request. *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 37 (request for hybrid representation does not constitute an unequivocal request for self-representation and was untimely when made three days before trial).

{¶ 84} The lead opinion includes two other discussions within the framework of the self-representation issue that must be addressed. The lead opinion claims the trial court failed to address a request for recusal and that the trial court "became irritated" with Ellis's assertions about the "fairness of the criminal justice system" and his own innocence. It appears these discussions were intended to bolster the conclusion that structural error occurred. Lead opinion at ¶ 64.

{¶ 85} Immediately before Ellis asked to proceed pro se, his counsel indicated that he believed, based on a discussion he had with Ellis, that Ellis would petition the court for a recusal and, in the alternative, seek self-representation at the trial. At no point did Ellis's counsel indicate any intention of formally ratifying either of Ellis's requests into motions — he simply relayed the information he believed to be relevant. When the trial court provided Ellis the opportunity to speak on his pro se requests, Ellis solely discussed the self-representation issue, omitting any reference to a recusal. Thus, the trial court did not ignore anything; there was no motion, oral or written, upon which a ruling was required.

{¶ 86} Further, Ellis was proving himself to be difficult after the court entertained his motion for self-representation. At that time, Ellis claimed that his criminal history was a product of his being "tricked into copping out as a lot of my brothers and sisters do it every day" and it was in this context that he believed he could not receive a fair trial to prove his "innocence" — Ellis had no issues with the quality of his attorney's services and, in fact, praised his attorney following the conclusion of trial. It was at this point that the trial court indicated it could "see where this could go" and the motion for self-representation was denied. The lead opinion then speculates that Ellis invoked his right because he lacked the protections or assistance of his counsel in the face of the "unrelenting pressure" of the trial judge to pressure Ellis into pleading guilty eight days earlier. Despite the fact that nothing in the record substantiates the lead opinion's speculative belief of what Ellis thought or felt, the lead opinion concludes that it is not surprising that

Ellis invoked his constitutional right. *Id.* at ¶ 59. It is unclear how the defendant's perception of the criminal justice system pertains to the self-representation issue, and for this reason alone, the lead opinion's reliance on the discussion within the framework of the assigned error is misplaced.

{¶ 87} Structural error "'affects the framework within which the trial proceeds'" and is not merely "'an error in the trial process itself.'" *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 132, quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In order to constitute structural error, the error must invade "'the entire conduct of the trial from beginning to end.'" *Id.*, quoting *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 17. "An error is structural only when it 'necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'" *Id.* quoting *Neder v. United* States, 527 U.S. 1, 9, 119 S.Ct. 1827, 144 L.Ed. 2d 35 (1999).

{¶ 88} The trial court's failure to rule on a motion never advanced cannot constitute error in the least. Further, the trial court's reaction to Ellis's commentary on the unfairness of the criminal justice system does not demonstrate any error in the judicial process. Although some courts may permit offenders greater latitude in critiquing the processes within our system of justice, a trial court's obiter dictum is not legal error. *See, e.g., State v. Esner*, 8th Dist. Cuyahoga No. 104594, 2017-Ohio-1365, ¶ 14.

{¶ 89} The only issue before this court in this delayed appeal is whether Ellis's invocation of his right to self-representation was unequivocal and timely. Failure to demonstrate either is grounds to affirm. The trial court's denial of an equivocal and untimely oral motion for self-representation on the morning of trial does not constitute "structural error" under Ohio law. A trial court's denial of the right to self-representation is error only if the defendant "properly invokes the constitutional right." *State v. Brown*, 8th Dist. Cuyahoga No. 106518, 2018-Ohio-3674, ¶ 6. Under *Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, Ellis did not do so. Further, the trial court's obiter dictum on other issues plays no part in the self-representation issue. The lead opinion is inappropriately combining several alleged procedural errors to demonstrate the existence of structural error. The law singularly recognizes that the failure to properly invoke the right to self-representation does not constitute structural error. *Brown*. Our inquiry should begin and end there.

**Conclusion**

{¶ 90} For these reasons, I agree with the decision to reverse the obstruction of official business conviction based on the insufficiency of the evidence, but I dissent from the remainder of the opinion.